I'm Gene Seiler of the Sixth Circuit Court of Appeals, a jurist of great experience, and also what I affectionately refer to as a full load-bearing judge, which means that I intend to give him his full share of the writing work. He is a viable member of this panel and has every bit as much authority to decide these cases. I look forward to every possible date to invite him to come back and sit with us again. So, Judge Seiler, welcome. Thank you. Glad to be here. First case up is Young v. City of Tampa. Mr. Rabine. Thank you, Your Honor, and may it please the Court, I'm Paul Rabine here for the Appellant Estate of Arthur Green. Also present in the courtroom is Mr. Green's widow, Lena Young Green, and two of his sons. This case happened because of a tragic set of events that took place on April 16, 2014. Arthur Green, an elderly man, was driving home from a gas station when he began to experience a hypoglycemic episode. Mr. Green had type 1 diabetes. With diabetes, you can have high blood sugar, which is hyperglycemic, or low blood sugar due to insulin, which is hypoglycemic. His insulin, his blood sugar was very low, he was experiencing a hypoglycemic episode, and that causes symptoms such as confusion, dizziness, and inability to follow commands. Approximately 29 million Americans suffer from diabetes. A person noticed, a witness noticed Mr. Green driving erratically, slowly. He drove up on a curb. She called police and told them that she believed Mr. Green was experiencing a medical emergency and needed help. The police were called and Officer Portman arrived at the scene. He saw at that point that Mr. Green's pickup truck was up on a curb. He flashed a siren, and then Mr. Green slowly took off back into the lane of traffic, slowly collided into two vehicles. I'm pretty much familiar with the allegation. You said something about the evidence shows, of course there is no evidence. We're at 12B6. Correct. Let me ask you one thing, just to make sure I read the complaint right. You allege that Portman knew or was informed through the call that somebody said it might be a medical problem. Correct. But there's no allegation that Smith knew that or was informed of that, is there? I believe there is an allegation of that, yes. Don't point me to that. It would be in paragraph . . . let me see here. Well, as to Defendant Portman, it's in paragraph 82, which states that Defendant Portman had actual and or constructive notice by virtue of the behavior or lack of physical evidence of intoxication. The decedent had a serious medical need and . . . I understand that's not what I'm asking about. I'm asking if the caller to the dispatcher's statement had been . . . if you alleged it had been conveyed to . . . To Smith or Portman? Yes. Actually, Portman you do, but Smith. Yes. Let me just find it for you. You can bring that up in your reply if you want to take up your time flipping that. I read through the facts common to all the counts, and it's not in there, if you alleged it . . . I believe it was alleged later as to both. Check it before you reply, but don't take any more time. Okay, but certainly it was alleged as to Portman. Not that the caller knew it was diabetes, just that he seemed to be having a medical condition. That's what I'm asking. And so, we've brought several different claims in this case. Let me tell you trouble. I'm trying to use your time most efficiently for my concerns. One troubling thing for your case is the short amount of time that elapsed between the stop and at 440, Portman approaching the car and observing the decedent, and his call five minutes later. You're basically saying that, as I understand the gist of your complaint, or part of the complaint, is that Portman didn't recognize it soon enough and didn't act soon enough. Five minutes is awfully fast for a car in the wrong lane, on a road like that, and the That sounds to me more like negligence than deliberate indifference. You've got to have some time to be deliberately indifferent, is what I'm suggesting to you. Answer my concerns about that. First of all, we allege that he did know it, okay? What's the it? Knew it. What's the it? Did know that he was suffering from a medical condition. Several different ways. From the 911 call, from the lack of evidence of intoxication, from his face, which he said was droopy. He said he had a blank stare and an inability to communicate. Those are the facts. When do you allege that he recognized that after the 440 stopped? He recognized that after he stopped him and was talking to him in the vehicle. You don't say that was 440 and a half minutes. I tried as best I could to give exact times, but I don't have the exact time for that. It was within the first couple of minutes, because he was talking to him in the vehicle. Let me tell you something else, because you brought it up in your response. He knew he was suffering medical problems. No, he didn't. He knew that someone had told dispatch that he might be. If someone called dispatch and said, there's a guy weaving on the road, he's drunk, you wouldn't be up here saying, well, he knew he was drunk. It was alleged that he knew, and the court is bound to take that allegation as true. If you know he's not intoxicated, but yet he's looking like this, acting like this, that's the only reasonable conclusion. I'm not sure we're bound to take a conclusion that he knew it. How do you know he knew it? How can you prove he knew it? All you can prove is he was informed of this, he saw that. How could I prove that he did know it? It's hard to get inside somebody's head when you're drafting a complaint and prove what he knew or didn't know. All we can do is tell you the facts of what he observed, what information he had, and I believe at the motion to dismiss stage, the court should give the plaintiff the benefit of the doubt and accept these allegations as true. In fact, they have to. I'm sorry. Go ahead, Judge. Did the decedent try to get back into the car once he got out? The decedent, he was asked to get out of the car, he did not. Another key fact is that the keys were removed from the ignition, so he was no longer a threat of trying to escape or take off in the vehicle. And then the officer tried to pull him out, and it's alleged in the complaint that Mr.  He sort of got back in in some way. He just wasn't able to get him out, I think is kind of more accurate. And then there was nothing going on for like two minutes where Officer Portman is standing there at the door waiting for backup. There was no any resistance, no trying to get away. He just kept saying over and over again, I didn't do anything wrong, I didn't do anything wrong. That's all. There's like two minutes where nothing is happening. So for your deliberate indifference claim, though, you have to show not only, right, that there is subjective knowledge, but also then a deliberate, you know, sort of plan to do nothing in the face of that subjective knowledge, right? And so on the latter piece of it, do I have the timeline, right, that the stop is at 440? At 442, they see his legs, 444, they call for help, and for what, 52, the help arrives and in the meantime they are trying to help him? I wouldn't know. I wouldn't say that at 442 they saw his legs, no. The whole incident took about ten minutes. Okay, 440. And I don't think charged the officers with how long it took somebody to get there after he was dispatched. The time from the stop, I thought was alleged, the time from the stop to the call, please send help, was five minutes, right? No, that's not correct. Oh, 440 was Portman approaches Green. 440 is when Portman approaches him, 442 is when Smith arrives, and then the call to 911, yes, was 445. You're correct. Okay, so you're talking about for Portman, five minutes at most until he called for help, and for Smith, you're talking about three minutes. Correct. But when somebody is on your back with their full weight and somebody else is pushing your legs up against your back and you're in a hypoglycemic state with very low blood sugar and you can't breathe for two minutes, that's enough to kill you. And so minutes matter very much, even though it's not a lot of minutes. When you can't breathe, that's a lot of minutes. And so I don't think you can just look at it like, oh, well, you can't be deliberately indifferent in five minutes. Yes, you can. If you know the person's having a medical issue, you've been told that, you have all this evidence that he is, and yet instead of trying to help him, you forcibly pull him out of the vehicle, throw him on the ground, and then suffocate him, that's deliberately indifferent. Can I ask you what may be sort of the ultimate question for this issue? Because this is an officer suit, the deliberate indifference piece of this is an officer suit, so you've got qualified immunity in play. Even if we were to sort of grant everything you've said to this point, what's the case law that would have put the officers on notice here? I didn't really see any effort, even, in the brief to point us to materially similar cases. Well, if you're referring to the excessive force claim, there's a number of cases. You don't have to have the case directly. Well, both to deliberate indifference and to excessive force, right? Those are both officer claims, right? Let me address the excessive force cases. Priester v. City of Riviera Beach, 208 F. 3rd, 919, where an officer had his dog bite the person who was not resisting, that was found to be clearly excessive. Smith v. Maddox, where the officer broke the person's arm who was not resisting, that was found to be clearly excessive. And Lee v. Ferraro, where a person who was not resisting had her head slammed against the trunk. It's our position that the act, while he was not resisting, while he was handcuffed, of continuing to put force on his body and deprive him of his oxygen, was clearly excessive in those cases of the bite. Just very briefly, is it your position that those cases would apply as well to the deliberate indifference claim? The excessive force cases, sort of? Yes. I mean, the excessive force has the diabetes aspect in it, too. So in some ways, they're combined. But in terms of, is there a case from the 11th Circuit that says if you know that somebody has diabetes, you can't take them down, no, there's not. But you don't have to have a specific case if it's clearly excessive. And given the prevalence of diabetes, and we did allege a number of times that we were officers, had encountered people with suffering similar behavior or symptoms, that's only two of the many officers on the force. We believe that this is the case that the court finds, that if you know these factors and you still take the person down, you still slam them on the ground, you still put your weight on their back, and you end up suffocating them, that this is the case where the court should find that that's clearly excessive. Going to our Monell claim, again, this touches on what I was just talking about. There's the issue of whether this is the case where the conduct of the need for training is so obvious that you don't have to show a prior violation. We believe this is the case. The Supreme Court in Canton did recognize that there would be cases where the need for training is so obvious that you don't have to show a prior constitutional violation. We believe that this is that case. And so the other side says about that point, well, the so obvious cases have been limited either by design or in practice to force cases. Do you have any cases outside the force context in which we have applied this so obvious exception? No, no. But there's no limitation on you applying it. And given the prevalence of diabetes, given the obvious need for training and the huge risk that people face if there is inadequate training, we believe that this is the case where this exception should be applied. The city of Tampa should be required to have training on how to handle with diabetes. The training is widely available from the American Diabetes Association and it would have prevented this case from happening. And so that's where we stand on our Monell claim. But I do want to focus on the excessive force. Again, I'm over your time. Okay. Why don't we let you have the full three minutes to reply. Okay. Thank you. Good morning. More police to court. Ursula Richardson on behalf of Officer Anthony Portman, Officer Anthony Portman, Officer Matthew Smith and the city of Tampa. What this case boils down to from the defendant's standpoint is that this, it's an unfortunate circumstance. We probably could say that a lot. Tragic circumstance. But what ultimately this complaint does not do is show that the only conclusion that Anthony Portman could have come to was that Mr. Green was medically impaired. Clearly, he got a 911 call indicating erratic driving. Just the fact that someone thought the driving was bad enough and it was important enough to call the city for assistance says it was probably pretty bad at that point. At that point, he knows that he's going to a call and probably in all calls where officers are encountering unpredictable or erratic driving, there's probably always the forethought that it could be medical impairment, it could be chemical impairment, alcohol impairment, or it could be both because there's always the possibility that the consumption of illegal alcohol could be a part of the epidemic. So what is an officer forced to do? Basically officers are charged with enforcing the laws of Florida and in this particular instance Anthony Portman not only hears the 911 call about the bad driving, but essentially observes, we've been talking about the curb incident, but not only is Mr. Green on the wrong side of the road, he's up on the curb on the wrong side of the road. So it's not just seeing him on the right side and then he's on the curb. He's actually on the wrong side of the road. He comes down off the embankment and apparently attempts to, or it appears that he's going to follow the officer turning on his lights and he does not do that and pulls off. Albeit slowly, but still in the wrong lanes of traffic and impacting other citizens who are doing lawful things. Are there vehicles? Yes sir, he did hit two vehicles that were traveling rightfully in the northbound lane as he was traveling in the southbound. Did these officers know that? This officer, the first officer observed this accident happen and called it in. So he actually observed Mr. Green pull away from him and then impact those two cars. Again, low impact, but still two traffic crashes, if you will, that this officer is observing. So the plaintiffs basically want the complaint or want your honors to take it that the complaint shows that this officer had knowledge, but this complaint does not show that the only conclusion that officer Portman could have come to is that this guy was medically impaired. Everything that they point to, whether it be his inability to answer simple questions, whether it be his slurred speech, his driving actions, all of those things are also equally consistent with criminal conduct, which in Florida is prohibited under the driving, under the influence statute, it's prohibited under the reckless driving statute. And on top of that, an officer who's there alone at that point tries to take control of the situation. And what the complaint says is that he tried once to ask Mr. Green to step out peacefully without going hands on. He did not come out. He asked him twice to come out. He does not do so and that the officer then tries to again take control of the situation, which is what we say that they are supposed to do is get control of a situation. And then Mr. Green, even though it's his medical condition that is causing the issue, he does in fact resist. Now, it's not violent resistance where he's punching or kicking at the officer, but pulling away from a police officer who just tried to take you out of the vehicle, pulling away from him is in fact a sign of resistance and that obviously is how officer Portman interpreted it such that backup was called and then when that backup arrived, the first thing they did was try to take control of Mr. Green. It's interesting that the complaint talks about the struggle. So although there are these timeframes, it's clear that the complaint says that Officer Smith doesn't even make his observation about Mr. Green's mottled legs or the thing that gives him the idea that he possibly has diabetes. He makes that observation while they're in the midst of this struggle and then clearly the timeline shows that after that observation is made and he passes that information on to Officer Portman and others, shortly within that timeframe there is a call for medical assistance from the Tampa Fire Rescue. So ultimately this complaint does not show that any officer had any actual subjective knowledge that Mr. Green was suffering from diabetes or any other serious medical condition because there were alternate or alternative conclusions about what was causing his behavior. It's our position, the defense's position, that just because Officer Portman did not interpret the clues as the plaintiff feels that they should have, it would have been fortunate if he had, but he did not. What was the evidence that he might have the problem? Was it the discolored leg or something else? The more definite information about what might have been his problem would have come from the mottled skin which would have been observed by only one officer, which is Officer Smith, during the course of the struggle to take Mr. Green into custody. Before that, all of the clues that the complaint talked about are also consistent with people who are impaired by alcohol, illegal drugs, bath salts, any number of things that could cause the symptoms that Mr. Green was exhibiting. And so the question really is for the court whether or not the conclusion is that any officer who doesn't come to the right conclusion if a person is doing something criminal but also has a medical issue, whether or not that officer should be faced with the possibility of being held liable for his judgment not leading him necessarily to the conclusion that may have saved the person that he's come in contact with. And that's really the essence of what we've been arguing is obviously Mr. Green was hypoglycemic. That's a dangerous condition. The trajectory of that position continues regardless of anybody's interference. And for these officers to then be placed into that trajectory and then held liable for failing to save him, that is the essence of what we've been arguing is that we did not contribute to his death or kill Mr. Green. His diabetes did that. But these officers should not be held liable for the possibility that they might have been able to turn the situation around for Mr. Green. So you're saying that he had hypoglycemia or diabetes or anything to these officers? No sir. First of all, no. And also the complaint does not allege that he was able to tell Officer Portman that he had any conditions. There were no indicia such as medical alert bracelets or other insignia of medical problems in his car, in or around his car. So no one ever told, and on top of that, the complaint does not allege that Officer Portman had any prior knowledge of Mr. Green. So this would have been the first time that he would have, according to the complaint, come in contact with this unknown person with this unknown condition and then being held responsible for not being able to address it. So your contention is that the deliberate indifference clock, so to speak, that Judge Carnes and I were asking about, begins to tick not at 440 at the stop when the evidence to Portman is ambiguous, whether it might be a medical issue as alleged to the dispatcher or it might be an impairment issue from outward appearances, but instead with Smith's recognition  and at that point they realize, oh no, this guy may have a diabetic episode and we need to help him. And at that point, the deliberate indifference clock begins to tick. That would be my position because that would be the first definitive, not even definitive, but at least real clue that there may be a more serious medical condition underlying the criminal conduct that they're dealing with. And we don't know from the allegations when that was specifically. All we know is from the use of the word then, paragraph 36, Officer Smith then left to get leg shackles out of his vehicle during the struggle. He noticed discolorations as he ran to his car. He warned the other officers that Mr. Green might have diabetes. So that was somewhere between 442 and 445. Yes, sir, at least because Officer Smith does not even arrive on scene until 442 and at that point they take him to the ground and then there is some struggle that occurs there for at least some period of minutes. Did this take down and handcuffing take place after Officer Smith suggested he had diabetes? No, that the taking Mr. Green to the ground in the prone position would have occurred as soon as Officer Smith arrived on scene at 442 and according to the complaint, Officer Portman never had an opportunity to explain to Officer Smith maybe what he had been observing of Mr. Green or anything that Mr. Green said. So there would have been no ability or I guess the time frame to have that conversation. Immediately when he arrives on scene, Officer Portman and Mr. Green are inside the cabin of or the passenger compartment of the car and Officer Smith immediately steps in to assist Officer Portman. And thereafter, sometime after 442, but again before 445, is when Officer Smith noticed the legs during the struggle. Also, we don't have a time for when Officer Smith noticed it, but a fair inference is that what happened is, what it says is, as he ran to the car, he warned the other officers and then if you look at paragraph 39, at approximately 444 p.m., four minutes into the incident, Defendant Portman finally noticed that Mr. Green might be having a diabetic issue. I mean, Smith says he may be having a medical issue. Portman recognizes he might be having a diabetic issue and had called that out. In other words, if, a fair inference I think is, if Portman had stated before 444 p.m. he might be having a medical issue, I'm sorry, if Smith had stated that, if that was the time Smith stated it before 444 p.m., then Portman wouldn't have first noticed it or would have called that out. In any event, we're talking about one minute or three minutes before the phone call was made. Correct. In any event, basically within, because what we're talking about is basically him being able to converse and being able to physically move his body and things like that and that's another issue. The complaint seems to indicate that he, it does indicate that he becomes unresponsive and he stops breathing, but clearly that's not what was happening before because he was struggling, because obviously Officer Smith noted that he did not have control of his legs and he needed to leave the struggle in order to get something to control the legs means that Mr. Green still had full use of his body in order to resist the number of officers that were trying to take him into custody and or control his resistant movements and to get him to be compliant. That is a situation that it's almost like we're asking officers to parse out part of their brains in a way instead of dealing with the immediate issue of there has been a criminal thing, we need to get control, that basically they should also in their minds be thinking could this be something else, could there be some liability that I'll face if I don't get it right. That's just a burden the defense really believes that should not be placed on police officers in the face of all other things that they deal with on a regular basis. In addition to that, the defense also believes that it's a slippery slope, that we start here with the prevalence of diabetes and we also need to address heart attacks, we also need to address seizures, we also need to address any number of medical conditions that may cause criminal behavior or mimic criminal behavior and then placing an officer in a position where their function and goal as police officers is not medical training or medical recognition, placing them in that position of being the front line of if you don't get it right, then your behavior is constitutionally deficient and you yourself are personally liable for what happens to that person. The defense believes that this case is not the right case for setting that particular kind of precedent and we would ask that your honors affirm the decision that was made by Honorable Mary Scriven down at the district court level and continue the officer's qualified immunity which is warranted in this case and also the claims against the city. I didn't address those specifically but those claims also rise and fall on whether or not the officers had any actual knowledge that Mr. Green was suffering from a serious medical condition. Certainly no one can say that from the deliberate indifference standpoint. Plaintiff is really arguing that what Connick says, Connick says that just because there is better training that may assist officers in doing their jobs, more or better training is not the test for whether or not a city then becomes constitutionally liable for not training its officers in this particular subject. Here, it's clear from the way the complaint is laid out and also in our response that there were no prior similar incidents. Unfortunately, this is an unfortunate, tragic, isolated incident but it doesn't rise to the level of municipal indifference that someone purposely decided that people were dying or that constitutional things were happening surrounding people with diabetes and that someone within the city's police department and or the city's administration deliberately decided not to do anything to assist officers in recognizing these particular issues. That's not the case here and this is also not the case to set any precedent concerning Monell as to this particular issue. Thank you. Thank you, Mr. Richardson. Mr. Raybon. To address Your Honor's question, the only allegation was that Portman specifically knew about the dispatch call but there is an allegation that he did. He did know? That he did know. Yes, that's in paragraph 16 of the complaint. Oh, Portman. Portman, yes. I'm still on Smith. My concern is, and we see this a lot and I understand the plaintiff's dilemma, the pressure to decide 12B6 motions in qualified immunity cases and take a hard look at them. You kind of have to sue everybody and let the litigation sort them out but if you're one of the folks who's not the central actor and you get sued, that's not much of a consolation so we have to look at each one individually. I do think there's deliberate indifference on his part as well because once they had him on the ground and they had him handcuffed, they continued to apply force to where he couldn't breathe and you see him struggling, you see him, he can't breathe but you keep doing it. That's deliberate indifference. This case was decided on a motion to dismiss. Counsel, my question was whether he had been told that someone else suspected that the before he noticed the legs. In paragraph 30, I went back through, defendants Portman and Smith had no discussion as to whether Mr. Green was having a medical issue and there's no allegation of that. The first time he noticed it was the discovered legs and he immediately warned the other officers. That's what's alleged, yes. I know but they're your allegations, not the defendant's. Yes. The problem with that is as soon as he notices it, he shouts the warning. Three minutes later, the call, less than three minutes later because he was restraining the plaintiff for a while, it took some time and we're asked to find that was deliberate indifference. It's very difficult to do for Smith. Well, they don't stop the suffocating him. They don't stop putting their weight on his back. They don't take his handcuffs off. They don't start CPR. That's where we find the deliberate indifference. Again, here's my concern. You're saying they. We can't view it as they. It has to be each individual defendant but I've taken up enough time. Take another two minutes on topic. Now, let's take diabetes out of the equation. We have an individual who was stopped, asked to get out of his car. One officer tries to pull him out. He falls back in the car. The officer then waits until backup arrives. At that point, there's no resistance. What do they. He's not a risk to flee. The keys are no longer in the ignition. He's not responsive. He's droopy face. He's still in the truck. So, the question is, have we alleged. Go ahead. Well, it may be okay to pull him out. Yeah, to get him out of the vehicle. Yes. But to pull him out and slam him on the ground and put your weight on his back and push his legs up against him. And we've alleged there's a policy of the city of Tampa that says that if you, if you place your weight on somebody's back, you run the risk of access association. So, they know that this is a risk. Is that excessive? Given the person is just sitting in their vehicle. They've got all of these symptoms. And then when you look at the case law that says a person who was previously resisting. And the case I'm talking about is the Smith versus Maddox. But is now on the ground and is no longer resisting. And then you break his arm. That's clearly excessive. Well, when a person sitting in a vehicle, no longer resisting, you pull him out, place your weight on him, push his legs up back against him and ultimately suffocate him. It's hard to say that that's not also clearly excessive under that set of facts. Now, that's setting aside the diabetes and all the other stuff. But just that set of facts on the motion to dismiss is sufficient. The court should not have granted the motion to dismiss on the excessive force claims. And one other point, we've heard a lot about the subjective knowledge of the officers and that they didn't know, it could have been this, it could have been that. Nowhere is that alleged. It's only alleged that they did have actual notice. And so it was inappropriate for the court to grant the motion to dismiss. That would have been more appropriately decided on a motion for summary judgment. Can I ask a procedural question on that point? Can you explain to me why is it exactly, do I understand correctly that discovery proceeded and concluded and then there was an order granting the discovery did conclude, but it did not conclude before the deadline to amend the complaint. So the allegations in the complaint, in the amended complaint were done prior to the expiration of the discovery deadline. Common practice in the middle court? Not that I'm aware of. There was quite a long time where we did quite a bit of discovery before the court ultimately granted the motion to dismiss. Contrary to all the Supreme Court decisions that said qualified immunity is immunity from lawsuit should be decided as early as possible time. But that's not your position or responsibility to disperse that on behalf of the state. Well, we feel that it was wrong to grant the motion to dismiss, that it should have at least proceeded to summary judgment.  Thank you.